E-FILED; Caroline Circuit Court
Docket: 9/10/2025 9:50 AM; Submission: 9/10/2025 9:50 AM
Envelope: 22864516

## IN THE CIRCUIT COURT OF MARYLAND FOR CAROLINE COUNTY

|  |  |
|---|---|
| LAURA CHEEZUM<br>11861 HOLLY PLAINS DRIVE<br>RIDGELY, MD 21660<br><br>        on her own behalf and on behalf of<br>        all others similarly situated<br><br>        Plaintiffs,<br><br>v.<br><br>VIVID SEATS, INC.<br>24 E. WASHINGTON STREET, SUITE 900<br>CHICAGO, IL 60602<br><br>VIVID SEATS, LLC<br>24 E. WASHINGTON STREET, SUITE 900<br>CHICAGO, IL 60602<br><br>        Serve both on:<br>        State Department of Assessments and<br>        Taxation<br>        700 E. Pratt Street, Suite 2700<br>        Baltimore, MD 21202-6377<br><br>        And<br><br>        Cogency Global Inc.<br>        600 South Second St., Suite 404<br>        Springfield, IL 62704-2542<br><br>        Defendants. | C-05-CV-25-000127<br><br>Case No.   _____ |

## CLASS ACTION COMPLAINT AND REQUEST FOR JURY TRIAL

Named Plaintiff Laura Cheezum ("Named Plaintiff" or "Cheezum"), through her attorneys

Cory L. Zajdel and David M. Trojanowski of Z Law, LLC, and Oren Giskan of Giskan, Solotaroff

& Anderson LLP, brings this action against Vivid Seats, Inc. and Vivid Seats, LLC ("Defendants"

or "Vivid Seats") for violations of the *Maryland Consumer Protection Act* ("MCPA"), MD. CODE ANN., COM. LAW §§ 13-301, *et seq.* In support of her claims, Named Plaintiff states:

## I.    PRELIMINARY STATEMENT

1.    This is a class action lawsuit brought against Vivid Seats for its deceptive and manipulative use of a bait-and-switch scheme commonly known as "drip pricing"[1]—a practice of advertising only part of a product's price and then revealing other charges in a non-initial step in the transaction as the consumer goes through the buying process.

2.    On average, this "drip pricing" model increases the cost of a Vivid Seats ticket between 25% - 50% and in some instances can increase the cost by more than 100% of the face value of the ticket after a non-initial step in the ticket purchase transaction.

3.    Vivid Seats does not sell any original tickets directly from any venue. Rather, Vivid Seats is a ticket marketplace where both Vivid Seats and third-party sellers list tickets for sale that were previously purchased from the venue or original ticket purchaser.

4.    Therefore, Vivid Seats is a "secondary ticket exchange" marketplace where consumers can buy and sell tickets for sports, concerts, and other live entertainment events. MCPA, § 13-310.1(a)(4).

5.    Defendants entice consumers to shop for tickets by displaying deceptively low prices that do not include mandatory fees. Only after a consumer has chosen tickets and invested time and effort clicking through an intentionally long, multi-page purchase process does Defendants reveal the mandatory fees added to the ticket price. These mandatory fees associated

---

[1] Will Kenton, Drip Pricing: What it Means, How it Works (Jan. 24, 2023), *available at* https://www.investopedia.com/terms/d/drip-pricing.asp (last visited August 28, 2025).

with Vivid Seats ticket sales are Service Fees, Electronic Transfer Fees, and Mobile Delivery Fees. ("Mandatory Added Fees").

6.    Vivid Seats displays deceptively low prices to sell more tickets at higher prices.

7.    For years, Vivid Seats used "drip pricing" on all tickets sold to events taking place throughout the entire country.

8.    Beginning on July 1, 2024, Maryland law explicitly banned "drip pricing" in ticket sales to Maryland residents regardless of where the ticketed event was located and enumerated the exact disclosures required throughout the ticketing purchase transaction. MCPA, § 13-310.1.

9.    Nonetheless, Vivid Seats refused to conform its ticket sales practices to eliminate "drip pricing" for Maryland consumers and continued to fail to disclose Mandatory Added Fees in the initial step in the transaction.

10.    Indeed, Vivid Seats includes some of the Mandatory Added Fees to customers when the event is scheduled to occur in certain states—showing that Vivid Seats is capable and has its own systems set up to display pricing up front instead of deceptively hiding it at the end. Nonetheless, depending on the location of the event, regardless of where the consumer shops, Vivid Seats still used partitioned pricing where the true amount of the tickets (inclusive of fees) was not disclosed until the end of the transaction. This means that, despite the recent wave of states that have passed anti-hidden fee laws, Vivid Seats in many instances, chooses to advertise a deceptively low initial price to residents of those states, surprising consumers with mandatory junk fees.

11.    To make matters worse, Vivid Seats uses a countdown clock to create a false sense of investment and urgency for consumers and to distract from and obfuscate the fact that the total purchase price at checkout is significantly higher than originally advertised.

3

12.    This "drip pricing" model is, and has always been, a deceptive trade practice that violates MCPA.

13.    On May 12, 2025, on the effective date of the FTC's Rule on Unfair or Deceptive Fees, 16 C.F.R. Part 464 (prohibiting bait-and-switch pricing to misrepresent total prices for live event ticketing), Vivid Seats updated its website and app to eliminate drip pricing and began disclosing all Mandatory Added Fees up front as part of the advertised price.

14.    For this reason, Named Plaintiff seeks relief in this action individually, and on behalf of all other ticket purchasers in the state of Maryland that used the Vivid Seats Website or Vivid Seats App to purchase tickets for events that Vivid Seats utilized drip pricing, for actual damages, reasonable attorneys' fees and costs.

## II.    PARTIES

15.    Named Plaintiff Laura Cheezum is a natural person and is a resident of the state Maryland.

16.    Defendant Vivid Seats, Inc. is incorporated under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois.

17.    Defendant Vivid Seats, LLC is a limited liability company created under the laws of the State of Delaware with its principal place of business in Chicago, Illinois.

18.    Vivid Seats owns and operates the website http://www.vividseats.com ("Vivid Seats Website") and the smartphone application ("Vivid Seats App").

## III.    JURISDICTION AND VENUE

19.    This Court has jurisdiction over this case under MD. CODE ANN., CTS. & JUD. PROC. § 1-501.

4

20.     This Court has personal jurisdiction over Defendants pursuant to MD. CODE ANN., CTS. & JUD. PROC. § 6-103(1)-(3), because Defendants have purposefully availed themselves of the laws, rights, and benefits of the State of Maryland. Defendants have engaged in activities including promoting live concerts in Maryland, systematically and continually transacts business in Maryland, and the case arises, out of a transaction that took place within Maryland, and Defendants contracts to supply goods or services in Maryland.

## IV.    FACTUAL ALLEGATIONS

### A.  Drip Pricing

21.     "Drip pricing" is a type of bait-and-switch pricing method that refers to the practice of advertising only part of a product's price upfront and revealing Mandatory Added Charges later as consumers go through the buying process.

22.     Behavioral economists generally concur that "drip pricing" leads consumers to overpay by exploiting individuals' inclination to complete a commenced purchase.[2] By enticing individuals into a transaction with an artificially low price, a website or application designer can instill a sense of commitment from the consumer to the transaction. By compelling the consumer to navigate through multiple screens, the website designer compels the consumer to invest time into the transaction. After a seller has introduced surprise fees on the final screen, assuming the consumer even perceives the fees, the consumer will still be hesitant to depart due to a perception of potential loss by abandoning the transaction.

23.     Consumers who are not provided the complete price until checkout are likely to proceed with their purchase even after the junk fee is revealed because they have already factored

---

[2] Steffen Huck & Brian Wallace, The impact of price frames on consumer decision making: Experimental evidence, at 1-3 (Oct. 15, 2015).

the deceptively low price into their decision and built purchasing commitment as they clicked through the transaction. Because of Vivid Seats' deceptively low advertised prices, which do not include fees, and because the process of clicking through the transaction builds purchasing commitment, consumers proceed with the transaction even after exorbitant and unpredictable fees have been added despite their better judgment—and despite the fact that continuing to search for cheaper prices would be more "optimal"—because consumers want to avoid "the cost of the time and cognitive effort involved" in continuing to search for a product or service.[3]

24.     Indeed, as companies that engage in junk fee practices are aware, consumers choose products or services based on the advertised "base price," and not based on the price inclusive of fees, which is obscured by partitions in the purchase flow.[4]

25.     Accordingly, "buyers may be hurt" because "[w]hen there is uncertainty over possible drip prices . . . consumers more frequently fail to identify the cheapest offer."[5]

26.     In fact, studies show that "consumers exposed to drip pricing . . . are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[6]

27.     As the FTC's Bureau of Economics has explained, the use of deceptively low prices at the outset of transactions while hiding junk fees until the end of the transaction adds steps to the

---

[3] Mary W. Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16–17, *available at* https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf.

[4] Alexander Rasch et al., *Drip Pricing & Its Regulation: Experimental Evidence*, 176 J. Econ. Behavior & Org. 353 (2020), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("[B]uyers . . . . based their purchase decision exclusively on the base price[.]").

[5] *Id.*

[6] Shelle Santana et al., *Consumer Reactions to Drip Pricing*, Marketing Science (forthcoming), at 4, *available at* https://business.columbia.edu/sites/default/files-efs/pubfiles/26100/Santana%20Dallas%20Morwitz%20Marketing%20Science%20forthcoming.pdf.

process of determining the actual price of a good or service, which forces consumers to pay more than they would if initially presented with full, complete prices.[7]

28.      As a result, when they reach the end of the transaction after they have already factored the low price into their decisions and built purchasing commitment as they clicked through the process, consumers are forced either to "incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly [purchase], or both."[8]

29.      The FTC has thus characterized junk fees as especially egregious when they are hidden (i.e., "disclosed only at a later stage in the consumer's purchasing process or not at all"), because openly disclosed junk fees would enable consumers to determine that the cost of a given product or service is not favorable relative to the cost charged by competitors and choose to do business elsewhere.[9]

30.      In many instances, companies keep the advertised price at the outset artificially low and pass some of the cost of the item into the junk fee that consumers do not see until the end, instead of adding the increased cost of the item to the low advertised price at the outset, which would deter consumers from being lured into the purchase flow. This allows companies to compound the benefit they obtain through these practices by increasing junk fees at a higher rate than they increase the base price of the underlying product or service itself.[10] As a result, the

---

[7] Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees, supra* n.3 at 2–3.

[8] *Id.* at 4; *see also* David Adam Friedman, *Regulating Drip Pricing*, 31 Stan. L. & Pol'y Rev. 51, 67 (2020) ("[S]ellers provide buyers with the 'initial value' in the form of the initially-presented base price. . . . Buyers are influenced by the initial value, so a lower base price would create the impression of a lower overall price." (citing Gorkan Ahmetoglu *et al., Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behaviour*, 21 J. Retailing & Cons. Services 696, 697 (2014))).

[9] *See, e.g., Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011* ("After a market leader took unilateral action to phase out hidden fees, the platform 'lost significant market share and abandoned the policy after a year because consumers perceived the platform's advertised prices to be higher than its competitors' displayed prices.'" (citation omitted)).

[10] *Id.*

product or service appears cheaper to consumers than competitors' products or services, even though the total cost of the product or service, inclusive of junk fees, is equally, if not more, expensive than those other companies' products or services.[11]

31.     Companies are also able to increase hidden junk fees without suffering meaningful market consequences.[12] In particular, companies can charge excessive junk fees in part because drip pricing impedes fair, honest, and free market competition as they are not adequately disclosed alongside the base price.[13]

32.     Hence, by using a deceptively low price while hiding the true cost of items inclusive of junk fees, companies can charge excessive junk fees while skirting economic consequences, as shrouding the fee encourages consumers to make their purchasing decisions based on only the base price, not inclusive of junk fees.

33.     Meanwhile, competitor companies and consumers face the consequences. Companies that advertise deceptively low advertised prices that do not include hidden junk fees will lure consumers away from properly behaving competitors that do not engage in such practices (and thus appear to charge higher prices) and will earn more profit than those competitors.[14]

34.     Using deceptively low prices and then later adding hidden junk fees also generates significant burden for individual consumers, who "pay upward of twenty percent more [when a company engages in drip pricing] than when the actual price was disclosed upfront."[15]

---

[11] *See id.*

[12] Rasch. *Drip Pricing & Its Regulation· Experimental Evidence, supra* n.4.

[13] *Id* ("[F]irms fiercely compete in base prices but not in drip prices." so "total price increases when firms use drip pricing").

[14] *Id* ("[W]here there is uncertainty about the drip size, sellers with a high drip-price limit can earn profits above the competitive level.").

[15] *See Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, supra* n.9 (explaining that hidden junk fees therefore "impose substantial economic harms on consumers").

35.    Moreover, the conduct of drip pricing runs afoul of the FTC Act itself. *See* 15 U.S.C. § 45(a)(1) (declaring unlawful "unfair or deceptive acts or practices in or affecting commerce").

36.    FTC's guidance on bait and switch advertising has long stated that "[n]o statement . . . should be used in any advertisement which creates a false impression of the . . . value . . . of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a).

37.    Mandatory Added Fees like those charged by Vivid Seats are called "junk fees" by the FTC.[16]

38.    The FTC's Trade Regulation on Unfair or Deceptive Fees, that went into effect on May 12, 2025, "specifies that it is an unfair and deceptive practice for businesses to offer, display, or advertise any price of live-event tickets . . . without clearly, conspicuously and prominently disclosing the total price[.]"

39.    This "drip pricing" FTC rule regulating undisclosed junk fees that went into effect on May 12, 2025, particularly in the live event ticket industry, authorized the FTC to seek civil penalties against companies that violate the FTC Act in this way.[17]

---

[16] As defined by the FTC, "junk fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer including goods or services that consumers would reasonably assume to be included within the overall advertised price" or fees that are "hidden," such as those "disclosed only at a later stage in the consumer's purchasing process or not at all." *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (codified at 16 C.F.R. pt. 464), *available at* https://www.federalregister.gov/documents/2022/11/08/2022-24326/unfair-or-deceptive-fees-trade-regulation-rule-commission-matter-no-r207011 (cleaned up).

[17] Fed. Trade Comm'n, Trade Regulation Rule on Unfair or Deceptive Fees, Summary, 89 Fed. Reg. 1992 (Jan. 10, 2025), *available at* https://www.federalregister.gov/documents/2025/01/10/2024-30293/traderegulation-rule-on-unfair-or-deceptive-fees.

40.     Advertising an artificially low price at the outset to lure consumers into the transaction while adding on exorbitant and variable junk fees at the very end is bad for consumers, is bad for competition, and is an unfair and deceptive practice.

**B. The Vivid Seats Website and Vivid Seats App.**

41.     "Vivid Seats is a leading online ticket marketplace committed to becoming the ultimate partner for connecting fans to the live events, artists, and teams they love." httsp://investors.vividseats.com (last visited September 1, 2025).

42.     Vivid Seats "utilizes [their] technology platform to connect facts of live events seamlessly with ticket sellers." Vivid Seats Annual Form 10-K at 4 (Mar. 12, 2025), *available at* https://investors.vividseats.com/static-files/dc9c2c9d-76db-4467-8ded-bca60213fc4f (last visited September 1, 2025).

43.     Vivid Seats "platform provides ticket buyers, sellers, and partners with an easy-to-use and trusted marketplace experience, ensuring fans can attend live events and create new memories." *Id.* at 4.

44.     In addition to providing a marketplace for third-party buyers, sellers, and partners to buy, sell, and resell tickets, Vivid Seats also offers resale tickets for sale that Vivid Seats purchased from venues and other original ticket issuers. *Id.* at 5 ("In our Resale segment, we primarily acquire tickets to resell on secondary ticket marketplaces, including our own.").

45.     In 2024, Vivid Seats processed more than eleven million (11,000,000) transactions, with gross order value totaled almost four billion dollars ($4,000,000.00), which included seven hundred seventy-five million dollars ($775,000,000.00) in revenue mainly from "service and delivery fees charged to ticket buyers." *Id.* at 39-40.

46.     Of the seven hundred seventy-five million dollars in revenue in 2024, around eighty-three and a half percent (83.5%) was derived from third-party transactions while sixteen and a half percent (16.5%) was derived from Vivid Seats reselling tickets that it purchased or acquired from original ticket issuers. *Id.* at 45.

47.     As explained in greater detail below, Vivid Seats advertises an artificially low price, then uses partitions, a countdown clock, and urgent pop-up warnings in its purchase flow to pressure users to pay added junk fees at the end of the transaction. These junk fees are nothing more than a way to pad Defendants' bottom line.

48.     Vivid Seats uses a deceptive purchase flow that emphasizes an artificially low price that does not include fees at the outset of the transaction. After Vivid Seats lures consumers in with artificially low prices that do not include fees, Vivid Seats' purchase flows then require customers to complete their transactions while under the pressure of a countdown clock. If the clock runs out, the consumer loses the tickets she was trying to purchase and must begin the transaction from the beginning.

49.     Throughout most of the transaction, Vivid Seats advertises artificially low-ticket prices that do not include Vivid Seats' fees because Defendants know (i) that consumers will focus only on the deceptively low initial price and (ii) that consumers will then buy more tickets and tickets at higher prices than they would have if the fees had been displayed throughout the transaction.[18]

50.     Vivid Seats could list the total price of the ticket at the inception of the process but affirmatively chooses not to. There can be only one reason for doing so: to give the impression

---

[18] *See* Tom Blake et al., *Price Salience and Product Choice*, 40 Marketing Science 4, pp. 619–36 (July-Aug. 2021), *available at https://faculty.haas.berkeley.edu/stadelis/AIP.pdf* (last visited August 28, 2025).

that the ticket price is lower than it actually is. Maryland's legislature has recognized this and explicitly banned this practice.

51.     When Vivid Seats' purchase flow uses an artificially low price at the outset that does not include Mandatory Added Fees until the end of the transaction, consumers are drawn into the purchase flow by that deceptively low price. Consumers then only have the artificially low advertised price to factor into their decision making while they must click through multiple screens under the pressure of a countdown clock—before they find out the true price inclusive of exorbitant Mandatory Added Fees.

C.     **Vivid Seats Purchase Flow.**

52.     Vivid Seats displays a deceptively low ticket price that fails to disclose the amount of mandatory fees through numerous stages of the transaction.

53.     After selecting an event, a consumer is directed to a page with various ticket options and asked to indicate the quantity of tickets they wish to purchase. After selecting the number of tickets, Vivid Seats displays ticket options with a price advertising a deceptively low price for each ticket without including the mandatory fee and without even notifying the consumer that mandatory fees will be added.

54.     After clicking the tickets, a screen pops out verifying the details of the event, number of tickets, and the deceptively low price, with no mention of any added fee. The consumer is presented with a button to "Checkout."

55.     Upon clicking "Checkout," the consumer is then taken to a sign-in screen. On this screen, the consumer must either enter their email (to "Continue as a Guest") or sign in to a Vivid Seats account. At this point, the event details and price move to the righthand side of the screen,

with the price listed under the heading "Ticket Details." The deceptively low price is listed on the righthand side of the page. until the very last screen.

56.     Once the consumer enters their email address (or signs in), Vivid Seats starts a countdown clock at the top of the screen, a ten-minute timer begins ticking down. Meanwhile, Vivid Seats admonishes the buyer to "Act fast! Secure your tickets now[.]"

57.     The countdown timer pressures consumers to complete the purchase and minimizes the time they have to make informed decisions.

58.     The timer has no function other than to build purchasing pressure for consumers. In fact, if a consumer does take the time (while the countdown clock is running) to review the "information" button next to the timer, they will learn: "Your tickets are not being held but we advise you to checkout quickly to get your preferred tickets."

59.     As the timer ticks down, Vivid Seats directs consumers through multiple screens where they enter personal information and information regarding payment—all before the true price is displayed.

60.     Vivid Seats then requires the consumer to enter their name, address, and telephone number. At this point, the consumer still has only seen the deceptively low ticket price. Vivid Seats has given no indication to the consumer that it will impose additional fees. Vivid Seats makes the consumer click yet again to "Continue to Billing."

61.     On this screen, the consumer selects a payment method for their tickets. The price remains displayed on the righthand side, away from the part of the screen where the consumer is repeatedly directed to take action and enter information. The countdown clock continues to tick down, next to the instruction to "Act fast!"

13

62.    In order to advance, the consumer must make yet another click in order to "Continue to Payment." Once they do, they are taken to the final checkout page. As the consumer clicks through the various pages, the countdown clock keeps running down, increasing the pressure towards a purchase.

63.    Here, the consumer is prompted to enter credit card information. Directly below the fields for credit card information is an offer to purchase insurance for a fee, followed by the "Place Order" button.

64.    It is on this final page, where the consumer enters their credit card information, that Vivid Seats makes the switch, springing the true cost of tickets on the customer for the very first time. Vivid Seats has added a "Service Total[.]"

65.    Because Vivid Seats uses an undisclosed formula to calculate its fee, a consumer cannot anticipate the amount that Vivid Seats will add. And the fee is far from incidental, and can increase the cost by over 40%.

66.    The new total is located in two places on this final screen, both of which Vivid Seats obscures through the design of the purchase flow.

67.    First, Vivid Seats buries the true cost in the middle of the fine print paragraph between the words "Confirm and Place Order" and the "Place Order" button. That text, written in the smallest font on the page, reads: "By clicking 'Place order', you agree to the Terms of Use and to the Rewards Program terms and conditions and confirm that you are aware that you are making a purchase on a resale marketplace and may be paying above face value for your tickets. Your credit card will be charged. All prices in USD. All sales are final."

68.    Second, Vivid Seats lists the fees on the righthand side of the page under Ticket Details, which has previously remained static and is separated from the screens on which the

consumer is directed to take action. On the righthand side, where each previous screen showed a price per ticket, the final screen of the purchase flow now includes lines for "Service Total" and "UPS Basic," along with "Total Charge."

69.    Vivid Seats advertised, and represented on every screen, tickets at a certain price each. But Vivid Seats in fact charges the consumer more than what a reasonable consumer would have expected.

70.    When a consumer chooses "Mobile Tickets," Vivid Seats charges an "Electronic Transfer" fee in addition to the Service Fee. Vivid Seats also does not display this fee until the checkout screen.

71.    On its Mobile App, Vivid Seats also lures consumers in with a deceptively low initial price, requires consumers to go through multiple steps (including entering personal and financial information) before the true price is available to the consumer, and hides the price.

72.    In fact, at the end of its App purchase flow, Vivid Seats hides the true price (that includes its hefty mandatory fees) behind the "Place Order" button—such that a consumer can complete their purchase without Vivid Seats having displayed the true price to that consumer at all.

73.    Once the consumer selects their tickets, Vivid Seats continues to represent falsely that the consumer can purchase the tickets for a certain price, and directs the consumer to "Checkout[.]"

74.    As on the website, Vivid Seats directs the consumer through a purchase flow where, under the countdown clock and on separate screens, the consumer must select their payment method, enter their credit card information, enter their billing address, enter their phone number, and choose whether to purchase insurance.

75.    Once the consumer has entered all of this information, the "Place Order" becomes available to click so that the consumer may complete the purchase. Notably, on this final screen, the price is still listed as a certain amount, totaling a certain total. That is, in this instance, Vivid Seats sells the ticket to the consumer (charging the hefty mandatory fees) without ever indicating that any fees will be charged, much less the amount.

76.    In fact, Vivid Seats hides the true total price is hidden behind the "Place Order" button. On each prior screen, the consumer could not scroll down below "Place Order." But on this final screen, unbeknownst to the consumer, if the consumer pulls the screen down further they will see a total.

77.    Even when Vivid Seats finally displays the additional mandatory fee amounts near the end of this lengthy purchasing process, it misrepresents the nature and purpose of those fees, while failing to adequately explain to consumers how they are calculated and what they are used for.

78.    The "Service Fee" amount can vary wildly, anywhere from a few dollars to upwards of 40% of the advertised ticket price. But Vivid Seats never explains to consumers throughout the purchase process how the fees for a particular ticket purchase are calculated. Even consumers who seek out this information elsewhere on the website are told only that the amount of the fee is "displayed prior to checkout."

79.    Thus, even consumers who have used Vivid Seats before and may expect that some Service Fee will be added at the end of the purchasing process can never predict how much those fees will be—until they invest time and effort completing Vivid Seats' burdensome purchase flow.

80.    Vivid Seats also misrepresents the nature of the Service Fee. Vivid Seats provides no information about the purpose of the Service Fee during the purchase flow. To a customer who

seeks this information out on the website, Vivid Seats states that the purpose of the fee is to "back every ticket sold with our 100% Buyer Guarantee" and "operate our fully staffed customer service center." But these costs are likely fixed and does not appear to have any connection to the wildly varying amount of the fees charged.

81.    In addition to the Service Fee, for mobile tickets Vivid Seats charges an additional fee per ticket for "Electronic Transfer" or "Mobile Delivery" (the "Transfer Fee").

82.    Vivid Seats also misrepresents the nature and purpose of the Transfer Fee. As Vivid Seats acknowledges, the electronic transfer is effectuated by the original purchaser of the ticket, not by Vivid Seats: "When Electronic Tickets that are purchased on a primary market website are resold on the secondary market, the seller will transfer the tickets from their account to the new buyer through the website they were originally purchased on." Indeed, Vivid Seats states that the email effectuating transfer "will come from a separate platform" after making the purchase on Vivid Seats.

83.    Vivid Seats charging the consumer a Transfer Fee for each ticket, when Vivid Seats does not in fact transfer the ticket, is unfair and deceptive. Either Vivid Seats does not incur any cost with respect to the transfer, or the fee per ticket hugely outstrips the associated cost. Given that Vivid Seats already charges the huge and variable Service Fee to consumers who purchase on the platform, the additional Transfer Fee serves only to line Vivid Seats' pockets at the customer's expense.

84.    When consumers make purchasing decisions, they want to know how much and for what they are being charged. Vivid Seats' affirmative misrepresentation of the purpose of its fees and failure to adequately explain the calculations and uses of their mandatory fees deprives consumers of this important information.

17

**D.    Plaintiff's Experience**

85.    Named Plaintiff Cheezum experienced the same unfair and deceptive purchase flow as every other Class Member during her Vivid Seats purchase.

86.    On or about February 4, 2025, Named Plaintiff Cheezum purchased two (2) tickets for a live event in Pennsylvania that was scheduled for August 27, 2025 from her home in Maryland through Vivid Seats.

87.    The purchase totaled six hundred sixteen dollars and twenty-four cents ($616.24).

88.    Vivid Seats did not initially advertise a price that included all Mandatory Added Fees.

89.    Vivid Seats initially advertised the two tickets as costing two hundred twenty-five dollars ($225) per ticket ($450 in total).

90.    After Named Plaintiff selected the $225 tickets and Named Plaintiff progressed through to a non-initial step in the transaction, Vivid Seats tacked on several Mandatory Added Fees including a Service Fee of ninety dollars and sixty-two cents ($90.62) per ticket ($181.24 in total) and an additional Electronic Transfer Fee of two dollars and fifty cents ($2.50) per ticket ($5.00 in total).[19]

91.    Vivid Seats increased the price by almost thirty-seven percent (36.94%) over the original advertised price of each ticket.

92.    Named Plaintiff Cheezum was not aware that the two tickets included one-hundred eighty-six dollars and twenty-four cents ($186.24) in Mandatory Added Fees when she first selected the tickets.

---

[19] Named Plaintiff's Order Summary shows that Named Plaintiff used a discount code to receive a twenty-dollar ($20.00) discount on her total purchase.

93.    The deceptively low initially advertised price of $225 per ticket was a substantial factor in Named Plaintiff Cheezum's decision to purchase the tickets.

94.    As a result of the pressure exerted by Vivid Seats in its purchase flow as described herein, Named Plaintiff Cheezum purchased the tickets despite the previously undisclosed Mandatory Added Fees.

95.    On February 2 ,2025, Vivid Seats initiated a transfer of Named Plaintiff Cheezum's tickets through Ticketmaster from the original purchaser to Named Plaintiff Cheezum.

## V.    CLASS ACTION ALLEGATIONS

96.    Named Plaintiff brings Count I on behalf of the proposed class consisting of the following individuals:

> All residents of Maryland who, on or after three years prior to the filing date of this case or on or before May 11, 2025, paid a Mandatory Added Fee through the Vivid Seats Website or Vivid Seats App where the price initially displayed did not include the amount of the Mandatory Added Fees.

Named Plaintiff also brings Count II on behalf of the proposed subclass consisting of the following individuals:

> All residents of Maryland who, on or after July 1, 2024 and on or before May 11, 2025, paid a Mandatory Added Fee through the Vivid Seats Website or Vivid Seats App where the price initially displayed did not include the amount of the Mandatory Added Fees.

> Excluded from the Class are those individuals: (a) who now are or have ever been Vivid Seats executives and the spouses, parents, siblings and children of all such individuals; (b) persons who properly execute and file a timely request for exclusion from the class; (c) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (d) Plaintiffs' counsel and Vivid Seats's counsel, and their experts and consultants; and (e) the legal representatives, successors, and assigns of any such excluded persons.

97.    The Class, as defined above, is identifiable. Named Plaintiff is a member of the Class and Subclass.

98.     The Class and Subclass consist, at a minimum, of one hundred (100) persons and is thus so numerous that joinder of all members is clearly impracticable.

99.     There are questions of law and fact which are not only common to the Class but which predominate over any questions affecting only individual class members.

100.    The common and predominating questions include, but are not limited to:

a.  whether Vivid Seats misrepresented the total cost of the tickets to Class members;

b.  whether Vivid Seats omitted material pricing information from the advertised prices of tickets;

c.  whether Vivid Seats' marketing, advertising, and/or selling of the tickets with misrepresentations constituted unfair and/or deceptive trade practices;

d.  whether Vivid Seats violated MCPA;

e.  whether Vivid Seats failed to disclose the total amount, including all fees, it would be charging Class members during the initial step of the ticket purchasing transaction;

f.  whether Vivid Seats made false and misleading statements of fact concerning the price of its tickets and ticketing selling services;

g.  whether Vivid Seats offered a no cost option to deliver electronic tickets to Class members;

h.  whether Vivid Seats misrepresented that it was providing a service in exchange for the Transfer Fee;

i.  whether Vivid Seats provided a "secondary ticket exchange" marketplace as that term is defined by MCPA, § 13-310.1(a)(4);

    j.   whether Vivid Seats violated MCPA, § 13-310.1(d) on or after July 1, 2024 when using drip pricing to sell tickets to consumers located in Maryland through a "secondary ticket exchange" marketplace;

    k.   whether Vivid Seats violated MCPA, § 13-310.1(d) on or after July 1, 2024 when failing to itemize all charges comprising the total price of the ticket in the ticket listing or initial step of the transaction through a "secondary ticket exchange" marketplace;

    l.   whether Vivid Seats may retain any Mandatory Added Fees it collected using drip pricing or after failing to itemize all charges comprising the total price of the ticket in the ticket listing or initial step of the transaction on or after July 1, 2024 for any ticket sold to a consumer located in Maryland; and

    m.   whether Vivid Seats may retain any amount collected in a transaction using drip pricing or after failing to itemize all charges comprising the total price of the ticket in the ticket listing or initial step of the transaction on or after July 1, 2024 for any ticket sold to a consumer located in Maryland.

101.    Claims of Named Plaintiff are typical of the claims of the Class and Subclass Members and are based on and arise out of similar facts constituting Vivid Seats' wrongful conduct.

102.    Named Plaintiff will fairly and adequately protect the interests of the Class and Subclass.

103.    Named Plaintiff is committed to vigorously litigating this matter.

104.    Named Plaintiff has secured counsel experienced in handling consumer class actions and complex consumer litigation.

105.    Neither Named Plaintiff nor her counsel have any interests which might cause them not to vigorously pursue this claim.

106.    The common questions of law and fact enumerated above predominate over questions affecting only individual Class and Subclass Members.

107.    A class action is the superior method for fair and efficient adjudication of the controversy.

108.    The likelihood that individual Class and Subclass Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

109.    The likelihood that individual Class and Subclass Members will prosecute separate actions is remote also because each individual claim involves a relatively small amount.

110.    Counsel for Named Plaintiff, the Class, and Subclass are experienced in class actions and foresee little difficulty in the management of this case as a class action.

## VI.    CAUSES OF ACTION

<u>**COUNT I**</u>
**(Violation of the Maryland Consumer Protection Act)**
**(Class)**

111.    Named Plaintiff incorporates each and every paragraph set forth herein.

112.    Defendants have violated the MCPA.

113.    The MCPA prohibits unfair, abusive, or deceptive trade practices. MCPA, § 13-301.

114.    Each Defendant is a "merchant," under the MCPA. MCPA, § 13-101(g)(1).

115.    A "merchant" means a "person who directly or indirectly either offers or makes available to consumers any consumer goods[ or] consumer services[.]" *Id.*

22

116.    Named Plaintiff and all Class members are "[c]onsumer['s.]" MCPA, § 13-101(c)(1).

117.    "Consumers" include any "actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit."

118.    "Consumer goods" and "[c]onsumer services" include "goods" and "services which are primarily for personal, household, family, or agricultural purposes."

119.    A "Ticket issuer" is a "merchant" under the MCPA.

120.    A "Ticket" is "[c]onsumer goods" or "[c]onsumer services" under the MCPA.

121.    Defendants' users receive consumer goods (tickets to live events) and services (access to live events, as well as a marketplace to purchase tickets to live events) for personal, household, or family uses and are therefore consumers under the MCPA.

122.    The MCPA prohibits misleading and deceptive trade practices in connection with the offer, sale, and supply of consumer goods and services.

123.    Under the MCPA, "unfair, abusive, or deceptive trade practices" include:

a.    "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;" (§ 13-301(1));

b.    Representations that "[c]onsumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;" (§ 13-301(2)(i));

c.    "[f]ailure to state a material fact if the failure deceives or tends to deceive;" (§ 13-301(3));

    d.   advertisement of consumer goods "[w]ithout intent to sell, lease, or rent them as advertised or offered;" (§ 13-301(5)(i)); and

    e.   "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods, consumer realty, or consumer service[.]" (§ 13-301(9)(i)).

124.    Defendants have engaged in misleading and deceptive trade practices in violation of the MCPA, by:

    a.   Advertising ticket prices that do not include Vivid Seats' Mandatory Added Fees;

    b.   Failing to adequately disclose material information to consumers concerning the true price of the tickets;

    c.   Failing to adequately disclose the amount of the fees at the outset of the transaction, which constitutes an ambiguity as to material facts that have the tendency to mislead and are deceptive trade practices;

    d.   Advertising or offering goods or services without the intent to sell them at the advertised price;

    e.   Charging a Transfer fee where no service is provided, there is no no-cost alternative offered to receive the ticket, and Defendants incur no discernible cost for providing digital ticket delivery; and

    f.   Affirmatively misrepresenting the nature and purpose of its mandatory fees, and failing to adequately disclose and making ambiguous statements regarding how its mandatory fees are calculated and what they are used for.

125.    Defendants' misleading acts or practices harmed Class members who have all lost

money in the amount of or part of the amount of the undisclosed portion of the Mandatory Added

Fees.

## COUNT II
### (Violation of the Maryland Consumer Protection Act)
### (Subclass)

126.    Named Plaintiff incorporates each and every paragraph set forth herein.

127.    MCPA prohibits generally any "[v]iolation of a provision of: (i) [t]his title."

MCPA, § 13-301(14)(i).

128.    The Maryland General Assembly amended the MCPA by adding § 13-310.1

with an effective date of July 1, 2024.

129.    As of July 1, 2024, the MCPA explicitly prohibits "drip pricing" in any ticket

sale by "secondary ticket exchanges, ticket issuers, and resellers" and enumerates specific

forms of disclosures required throughout the ticket purchasing transaction. MCPA, § 13-

310.1(b).

130.    Vivid Seats is a "secondary ticket exchange[,]" and a "reseller" under the

MCPA. MCPA, § 13-310.1(a)(3) and (a)(4).

131.    A "Ticket" is "[c]onsumer goods" or "[c]onsumer services" under the MCPA.

132.    Defendants' users receive consumer goods (tickets to live events) and services

(access to live events, as well as a marketplace to purchase tickets to live events) for personal,

household, or family uses and are therefore are consumers under the MCPA.

133.    MCPA requires that any ticket listing "and each step of a transaction to purchase a

ticket" to "disclose the total price of the ticket, including all fees and taxes[.]" MCPA, § 13-

310.1(b)(2)(i).

134.   MCPA also requires that any ticket listing "and each step of a transaction to purchase a ticket" to "[p]rovide an itemized listing of all charges that comprise the total price of the ticket, including all fees and taxes[.]" MCPA, § 13-310.1(b)(2)(ii).

135.   In addition, MCPA restricts any party from increasing the "total price of a ticket . . . in a non-initial step of a transaction" except for "the amount of reasonable shipping costs for physically delivered tickets." MCPA, § 13-310.1(b)(3)(i).

136.   Vivid Seats violated MCPA by failing to disclose the "total price of the ticket" in the ticket listing or initial step of the transaction. MCPA, § 13-310.1(b)(2)(i).

137.   Vivid Seats violated MCPA by failing to itemize "all charges that comprise the total price of the ticket" in the ticket listing or initial step of the transaction. MCPA, § 13-310.1(b)(2)(ii).

138.   Vivid Seats violated MCPA by increasing the "total price of a ticket . . . in a non-initial step of a transaction[.]" MCPA, § 13-310.1(b)(3)(i).

139.   Vivid Seats violated MCPA by providing a "secondary ticket exchange" marketplace on or after July 1, 2024 while failing to disclose the "total price of the ticket" in the ticket listing or initial step of the transaction. MCPA, 13-310.1(d).

140.   Vivid Seats violated MCPA by providing a "secondary ticket exchange" marketplace on or after July 1, 2024 while failing to itemize all charges comprising the total price of the ticket in the ticket listing or initial step of the transaction. MCPA, 13-310.1(d).

141.   Vivid Seats violated MCPA by providing a "secondary ticket exchange" marketplace on or after July 1, 2024 while increasing the "total price of a ticket . . . in a non-initial step of a transaction[.]" MCPA, 13-310.1(d).

142.   Defendants' misleading acts or practices harmed Subclass members who have all lost money in the amount of the undisclosed portion of the total ticket price.

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiff seeks the following relief for herself and the proposed Class and Subclass:

        a.   An order certifying the asserted claims, or issues raised, as a class action, appointing Named Plaintiff as Class Representative, and Plaintiff's counsel as Class Counsel;

        b.   A judgment in favor of Named Plaintiff and the proposed Class and Subclass;

        c.   Damages;[20]

        d.   Reasonable attorneys' fees and costs, as allowed by law;

        e.   Pre- and post-judgment interest;

        f.   Any additional relief that the Court deems reasonable and just.

Respectfully submitted,

Z LAW, LLC

Dated: September 10, 2025

/s/Cory L. Zajdel
Cory L. Zajdel, Esq. (CPF #0412150442)
David M. Trojanowski, Esq. (CPF #1412180233)
2345 York Road, Suite B-13
Timonium, Maryland 21093
(443) 213-1977
clz@zlawmaryland.com
dmt@zlawmaryland.com

Oren Giskan (*pro hac vice to be filed*)
GISKAN SOLOTAROFF & ANDERSON LLP
1 Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 847-8315
ogiskan@gslawny.com

*Attorneys for Named Plaintiff*

---

[20] Pursuant to Maryland Rule 2-305, Named Plaintiff states that her individual claim totals less than $75,000.00 but the claims of all Class members total more than $75,000.00.

27

## IN THE CIRCUIT COURT OF MARYLAND FOR CAROLINE COUNTY

| | |
|---|---|
| LAURA CHEEZUM<br><br>on her own behalf and on behalf of<br>all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>VIVID SEATS, INC.<br><br>VIVID SEATS, LLC<br><br>Defendants. | C-05-CV-25-000127<br><br>Case No. _____ |

## <u>REQUEST FOR JURY TRIAL</u>

Named Plaintiff demands the right to a jury trial on all claims so triable.

Respectfully submitted,

Z LAW, LLC

Dated: September 10, 2025

/s/ Cory L. Zajdel
Cory L. Zajdel, Esq. (CPF #0412150442)
David M. Trojanowski, Esq. (CPF #1412180233)
2345 York Road, Suite B-13
Timonium, Maryland 21093
(443) 213-1977
clz@zlawmaryland.com
dmt@zlawmaryland.com

Oren Giskan (*pro hac vice to be filed*)
GISKAN SOLOTAROFF & ANDERSON LLP
1 Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 847-8315
ogiskan@gslawny.com

*Attorneys for Named Plaintiff*